UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____ -CIV- _____

Magistrate Judge _____

**02-21932**
**CIV-UNGARO-BENAGES**

**MAGISTRATE JUDGE**
**BROWN**

UNITED TEACHERS OF DADE,
a labor organization, and ANNETTE
KATZ,

     Plaintiffs,

v.

MERRETT R. STIERHEIM, in his
official capacity as Superintendent
of Miami-Dade County Public
Schools, and the SCHOOL BOARD
OF MIAMI-DADE COUNTY,

     Defendants.

_____/

# COMPLAINT

The plaintiffs, United Teachers of Dade ("UTD"), a labor organization, and

Annette Katz, individually and as an agent of UTD, sue the defendant, Merrett R.

Stierheim, in his official capacity as Superintendent of Miami-Dade County Public

Schools, and the School Board of Miami-Dade County, and allege:

1.     This is an action for a declaratory judgment, temporary and permanent

injunctive relief, and damages brought pursuant to 42 U.S.C. § 1983 to enforce rights secured to the plaintiffs by the First and Fourteenth Amendments to the United States Constitution. This Court thus has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

2.    Plaintiff UTD is a teachers union with its principal office in Miami-Dade County, Florida, and is publisher of *UTD Today*, a monthly newspaper. Plaintiff Ms. Katz is an employee and agent of UTD and serves as editor and a reporter for *UTD Today*. Both plaintiffs are citizens of the United States.

3.    The defendant, Merrett R. Stierheim, is the Superintendent of Miami-Dade County Public Schools, a political subdivision of the State of Florida with its principal office in Miami-Dade County. He is appointed by the School Board of Miami-Dade County and acts as its agent. He is sued in his official capacity.

4.    The School Board of Miami-Dade County is a "person" within the meaning of 42 U.S.C. § 1983. At all times material to this action, Mr. Stierheim acted under color of state law as chief administrator for the School Board. He is invested by the School Board with full authority to enact the express policy at issue in this case.

5.    The School Board provides a press room to facilitate the news media's coverage of its meetings. While in the press room the news reporters can hear and see the School Board meeting from behind large windows, while working where they can speak to their editors and others by telephone and use laptop computers without

-2-

disturbing the people in attendance at the meeting.

6.      As editor and reporter for *UTD Today*, for more than two decades Ms. Katz has routinely made use of the School Board press room to cover meetings of the School Board of Miami-Dade County.

7.      *UTD Today* covers the School Board's activities intensively and is an important source of news and viewpoints about School Board issues for its 19,000 subscribers. It is circulated not only to UTD members, but also, without discrimination, to anyone who pays the subscription fee.

8.      Mr. Stierheim has recently promulgated an administrative regulation to govern the use of the School Board press room. A copy of the regulation, along with a cover memorandum and the attachments to the regulation, is attached to this Complaint as composite Exhibit A. Pursuant to the attached regulation, effective on May 15, 2002, the use of the press room was prohibited to any news media representatives "who work for union publications."

9.      Pursuant to this provision, Ms. Katz, for the first time in two decades, has been prohibited from using the press room to cover School Board meetings. She has been banished from the press room during regular monthly School Board meetings in May and June and two special meetings during the same period.

10.     While nothing in the law requires the School Board to create a press room to facilitate the reporters in covering the School Board, in the event the School Board

-3-

decides to provide such a facility, it may not discriminate against certain news reporters based on the content or viewpoint of their publications.  The School Board's policy of prohibiting news media representatives "who work for union publications" from the press room is a violation of the UTD's and Ms. Katz's First Amendment right to freedom of speech and of the press, as applied to the School Board of Miami-Dade County by the Fourteenth Amendment, and their Fourteenth Amendment rights to due process and the equal protection of the laws.

11.    The School Board's policy of prohibiting news media representatives "who work for union publications" from the press room is facially invalid as a form of content-based discrimination unsupported by any sufficient governmental interest.

12.    The School Board's policy of prohibiting news media representatives "who work for union publications" from the press room is unconstitutional as applied to *UTD Today* and Ms. Katz inasmuch it is unsupported by any sufficient governmental interest.

13.    The UTD and Ms. Katz have thus been deprived of their constitutional rights during the recent period of their banishment from the press room.

14.    The next School Board meeting is scheduled to take place on July 10.  The plaintiffs and their attorneys have met with agents of the School Board, acting for Mr. Stierheim, in an effort to resolve this matter.  However, as of this writing, the School Board has remained steadfast in support of its unconstitutional policy.  Therefore, there is a real and imminent threat that the plaintiffs will be wronged again.

-4-

15.     The defendants' conduct has forced the plaintiffs to engage the services of counsel to obtain redress for the deprivation of their constitutional rights.  Pursuant to 42 U.S.C. § 1988, the plaintiffs are entitled to recover the costs of this action, including attorneys' fees, against the School Board of Miami-Dade County.

## COUNT I: DECLARATORY JUDGMENT
## AND SUPPLEMENTAL RELIEF

16.     The allegations of paragraphs 1 through 15 are incorporated here by reference.

17.     This is an action against Mr. Stierheim, in his official capacity, for a declaratory judgment and supplemental relief.

18.     Mr. Stierheim, acting under color of state law, has enacted a policy that, on its face, deprives the UTD and Ms. Katz of rights, privileges and immunities secured by the First and Fourteenth Amendments to the Constitution of the United States.

19.     Alternatively, Mr. Stierheim, acting under color of state law, has enacted a policy that, as applied, deprives the UTD and Ms. Katz of rights, privileges and immunities secured by the First and Fourteenth Amendments to the Constitution of the United States.

20.     There is a real and imminent threat that the plaintiffs will be wronged again pursuant to the attached School Board policy on July 10, 2002, and during subsequent School Board meetings.

WHEREFORE, the plaintiffs pray that this Court take jurisdiction over this matter

and enter a declaratory judgment that the School Board's policy of prohibiting news reporters "who work for union publications" from the press room is unconstitutional, facially and as applied; grant the plaintiffs temporary and permanent injunctive relief to prohibit Mr. Stierheim from enforcing this policy with respect to Ms. Katz or any other reporter for *UTD Today*; award costs and attorneys' fees to the plaintiffs; and grant any other relief the Court deems appropriate.

## COUNT II: DAMAGES

21.    The allegations of paragraphs 1 through 15 are incorporated here by reference.

22.    This is an action for damages against the School Board of Miami-Dade County.

23.    The School Board of Miami-Dade County is a "person" within the meaning of 42 U.S.C. § 1983.

24.    The policy enacted by Mr. Stierheim of prohibiting news reporters "who work for union publications" from the press room, and denying Ms. Katz the use of the press room during School Board meetings in May and June of 2002, was enacted by Mr. Stierheim as an express policy of the School Board, under color of state law.

25.    The School Board's express policy has deprived the UTD and Ms. Katz of rights, privileges and immunities secured to them by the First and Fourteenth Amendments to the United States Constitution.

26.     The UTD and Ms. Katz have suffered damages flowing from the deprivation of their constitutional rights and are therefore entitled to damages pursuant to 42 U.S.C. § 1983.

WHEREFORE, the UTD and Ms. Katz pray that this Court take jurisdiction over this matter; enter an award of damages in their favor and against the School Board of Miami-Dade County for the deprivation of their constitutional rights; award them their costs and attorneys' fees; and grant any other relief the Court deems appropriate.

Respectfully submitted,

Robert Rivas
The Rivas Law Firm
311 S. Calhoun St., Suite 206
Tallahassee, FL 32301-1802
*Tel:* (850) 412-0306
*Fax:* (850) 412-0909
Florida Bar No. 896969
RobRivas@aol.com

**MEMORANDUM** May 14, 2002

TO: The Honorable Chair and Members of The School Board of Miami
Dade County, Florida

FROM: Merrett R. Stierheim
Superintendent of Schools

SUBJECT: **NEW PRESS ROOM PROCEDURES**

For your information, I am transmitting to you new press room procedures that will be in
place starting with the May 15, 2002 Board meeting. If you have any questions, please
refer them to Communications Executive Officer Mayco Villafaña at (305) 995-4638.

MRS:ebm
M-1743
Attachments

cc: Superintendent's Executive Staff
School Board Attorney

# Composite Exhibit A

**MEMORANDUM**                                              May 14, 2002

TO:        Mr. Merrett R. Stierheim
           Superintendent of Schools

FROM:      Mayco Villafaña
           Communications Executive Officer

**SUBJECT:    PRESS ROOM PROCEDURES**


As you know, the Office of Public Relations oversees a press room located in the auditorium of the School Board Administrative Building (SBAB). Soon after coming on board, I began a review of press room utilization and heard from reporters and M-DCPS public relations staff regarding the lack of procedures governing the use of the press room. I am attaching letters that address some of the media's concerns. In general, press rooms provide reporters an area having desks, phones and chairs (nowadays even Internet connections) from where they can electronically transmit their news stories to their newsrooms or confer with their editors via phone. Reporters want a press room unfettered from any undue influence. Other major school systems nationwide have procedures in place to manage media access to school board meetings. I am attaching a memorandum detailing some of the procedures used by other school districts.

Starting with the May 15th Miami-Dade County School Board meeting, the Office of Public Relations will restrict access to the press room to working media representatives. State statutes generally define working media as individuals employed by a newspaper or broadcast organization intended for general circulation. It does not include a newspaper intended primarily for members of a particular profession or occupation. I am attaching a memorandum from the School Board Attorney dated February 5, 2002, regarding the use of a press room. It provides case law indicating the authority of a public board to establish a room for the use of the press as well as the legal guidance the courts have presented in regards to *accredited news gatherers*.

Individuals who do not meet the above requirements of *accredited news gatherers* will be denied access to the press room. For example, no one employed by the School Board or the School District (except members of the Office of Public Relations and employees who service the room) may have access to the press room. In addition anyone having business before the School Board, addressing the Board, or attempting to influence School District policies will not be allowed in the press room. This includes any and all MDCPS employees working in the district office or any of its regional offices, schools or satellite facilities. This includes, but it is not limited to vendors, lobbyists, their clients and/or their legal representatives, union members or anyone employed by the various labor unions in any capacity including those who work for union publications. Members

of the public attending School Board meetings, regardless of whether they sign to speak before the School Board or not, will not be permitted to enter the press room.

It is the prerogative of any member of the working media to call any individual into the press room who is not a member of the working media as long as the purpose is for a quick interview or a brief clarification of a newsworthy issue. If the interview will be lengthy, reporters will be asked to conduct the interview outside of the press room. Working members of the media are prohibited from inviting friends, associates or anyone not connected with a news assignment from being in the press room at any time.

These rules will apply to any and all official sunshine meetings of the Miami-Dade County School Board taking place in the SBAB auditorium.

Through this memorandum I am asking that you recognize these new procedures as an administrative directive.

_____ MV

MV:ebm
M-808

Attachments

Approved: _____
Merrett R. Stierheim

# W P L G / T V 1 0

2002 APR 17 PM 4:43   A POST-NEWSWEEK STATION

OFFICE OF PUBLIC INFORMATION
AND MEDIA RELATIONS

April 11, 2002

Mayco Villafana
Miami-Dade County Public Schools
Public Information Office

Dear Mayco,

I'm writing to make you aware of the many issues involving the **PRESS ROOM** at the Miami-Dade Public School Auditorium. Realizing that you are new to the district operations, and the Press Room was at the center of a controversy at last month's meeting, I wanted to fill you in on what's been happening in there for the last two years.

The Press Room was where at least three UTD officials always sat... Pat Tornillo, Merri Mann and Annette Katz. They usually got there very early and took up the best seats in the room. Reporters were often forced to sit and take notes on their lap or try to balance their computer on their lap because there was no desk space for them. In addition, UTD used the Press Room as a staging area for their organized protests. Often this involved other unions and other union bosses. They would all congregate in there, talk loud, crowd the room and take up seating for the press. This has been somewhat resolved since the district informed Mr. Tornillo that only the media would be allowed in the room.

Annette Katz continues to sit in the press room as UTD's representative. Her presence however, is very troubling for a number of reasons. Her union is increasingly the subject of media reports. I have never been in another Press Room where subjects of media reports shared space with the media. As a result of her easy access to the media, Mrs. Katz uses her presence to lobby the union's point of view on a variety of issues. Not a problem, except that's not the purpose of that room.

She has verbally attacked me and other reporters when we've done stories she or UTD did not like. She frequently editorializes and often maligns Superintendent Stierheim and certain board members. While I respect her right to free speech and I'm more than capable of fighting back when attacked... it is not the work

environment any member of the media should have to deal with when they enter a "working" Press Room. We go there to do our work, not trade verbal barbs with Mrs. Katz. I have even been forced to ask her to step outside to continue her attack so as not to interrupt the work of other reporters.

While I realize that it is the School Board's Press Room and you can give access as you see fit... I hope you'll consider the ongoing ramifications of non media members being present in that room. Any message a board member or Superintendent or union or the public wants to get across to the media, should be done in the public forum of the public school board meeting. They can even ask for side conversations outside, as most already do.

Please be clear, this is not just a UTD problem. There is one board aide who frequently camps out in there. Several top administrators come in to sit, nap, eat cookies and generally hang out. In fact, the district's Press Room was little more than a party room for a long time, since, as I believe, the media was rarely there. That has changed and we are not going to disappear. I urge you to either create and enforce a professional "working" Press Room or abandon the idea of having one at all. At least the members of the press corps will know what to expect.


Very Sincerely,

Jilda Unruh
Investigative Reporter
(o) 305-325-2435
(fax) 305-325-2335
(e-mail) junruh@click10.com

## The Miami Herald

www.herald.com

Mr. Mayco Villafana
Communications Executive Officer
Miami-Dade County Public Schools

April 15, 2002

Dear Mayco:

I would like to call your attention to a situation occurring at monthly
School Board meetings that might be inappropriate:

Members of the United Teachers of Dade staff, including communications
director Annette Katz and occasionally president Pat Tornillo, encamp
themselves in the press room during meetings, at which important
decisions are made that directly affect the UTD.

Ms. Katz, Mr. Tornillo and other union officials are decent folks, and my
concern is not personal. But I believe reporters need to be unfettered as
they report and write their stories, some of which include the UTD.

I will support whatever manner you feel is appropriate to handle this
situation.

Regards,

Bob Radziewicz
Education Editor
The Miami Herald

305-375-3506
bradziewicz@herald.com

MEMORANDUM                                                                May 14, 2002

TO:        Mayco Villafaña, Communications Executive Officer
           Office of Public Relations

FROM:      John Schuster, Supervisor
           Office of Public Relations

**SUBJECT:  PRESS ROOM USAGE**

Following are notes regarding press room usage in selected school districts.

BROWARD COUNTY, FLORIDA

1. An area is set aside in the back of the school board auditorium for television cameras. A table is available for newspaper reporters. Signs designate "press only."

2. The area is for use by credentialed reporters only.

3. Community Relations personnel are available to facilitate retrieving documents, if needed.

4. Reporters can meet with school or union officials outside the school board chambers if they choose to, but not in the press area.

ORANGE COUNTY, FLORIDA

1. No designated area is set aside for the media. Reporters are welcome to sit in the auditorium with everyone else. There is a break-out box for electronics to get audio feeds.

2. Community Relations personnel are familiar with reporters and know them by name. Many wear their own I.D.'s designating them as media.

3. Reporters who wish to meet with school or union officials may do so in the auditorium after the meeting or in the lobby during the meeting.

CHICAGO PUBLIC SCHOOLS, CHICAGO, ILLINOIS

1. No separate press area. Media representatives check in on the ground floor with security and are escorted to the fifth floor school board meetings.

2. The first row in the auditorium is set aside for reporters. TV cameras must stay to the side aisles.

3. Reporters bring their own company-issued credentials. Community Relations personnel are

familiar with the reporters, usually.

4. Reporters who wish to interview school or union officials do so outside the school board chambers.

## NEW YORK CITY CENTRAL BOARD OF EDUCATION, NEW YORK

1. The school board meets in a formal board meeting type room. There is no designated press area.

2. Media representatives sit in the audience. TV cameras are placed to the sides.

3. Public information personnel generally know the education reporters and do not have to ask for credentials.

4. If a reporter wishes to speak with school or union officials, they generally do so outside the meeting room.

## LOS ANGELES UNIFIED SCHOOL DISTRICT, LOS ANGELES, CALIFORNIA

1. A press room is located across the hallway from the school board chambers. Media representatives can view the proceedings via closed-circuit TV. They have phone lines to plug in their laptops. Reporters may also sit in the auditorium.

2. The room is open only to members of the media.

3. Media representatives wear identification issued by the media outlet.

4. Media representatives who wish to ask a union representative for their reactions or thoughts may do so in the hallway, but not in the press room.

**M E M O R A N D U M**                                        February 5, 2002


TO:           Mr. Merret R. Stierheim
              Superintendent of Schools

FROM:         Attorney's Office

**SUBJECT:   REQUEST FOR LEGAL OPINION REGARDING USE OF PRESS ROOM**


This is in response to your request for a legal opinion submitted by memorandum dated
January 18, 2002. (copy attached). You have indicated that a sign on the press room door
in the School Board Administration Building auditorium states, "Due to capacity constraints,
use of the press room will be reserved for credentialed members of the media and
appropriate M-DCPS staff." You asked for an opinion addressing "who may use and who
may be excluded from using the [press] room, as well as what constitutes media
credentials."

Although meetings must be open to the public, a public board or commission can set aside
an area for members of the press. See e.g. Westinghouse Broad. Co. Inc. v. Dukakis, 409
F. Supp. 895 (D. Mass. 1976) (Boston City Council provides a specific section of the
chamber floor for the press, which has electrical outlets and other conveniences);
Consumers Union of U.S., Inc. v. Periodical Correspondence Ass'n., 365 F. Supp. 18
(D.D.C. 1973) (Senate and House press galleries not open to general public). Therefore,
as an initial matter, the School Board has the authority to establish a room for the exclusive
use of members of the press.

However, once a press room is established, the School Board must give all members of
the press equal access. Under the First Amendment, press organizations have a limited
right of access to newsworthy events in their capacity as representatives of the public and
on their own behalf as members of the press. WPIX v. League of Women Voters, 595 F.
Supp. 1484 (S.D.N.Y. 1984). Once there is a public function, public comment, and
participation by some of the media, the First Amendment requires equal access to all of the
media. American Broad. Co., Inc. v. Cuomo, 570 F.2d 1081, 1083; see also, Cable News
Network v. American Broad. Co., Inc., 518 F.Supp. 1238, 1245 (enjoining White House
from excluding all television press while admitting *members* of the print media);
Westinghouse Broad. Co., Inc. v. Dukakis, 409 F. Supp. 895, 896 (opportunity to cover
official news sources must be the same for all *accredited* news gatherers).

Mr. Merret R. Stierheim                                            February 5, 2002
                                                                   Page 2

While these cases do not define who is a "member" of the media or an "accredited news gatherer," state statutes through definition of "newspaper" provide guidance as to what constitutes the media. For example, with respect to newspapers, state statutes requiring publication of official notices and the like in a "newspaper of general circulation" have defined that phrase as "a newspaper printed in the language most commonly spoken in the area within which it circulates and which is readily available for purchase by all inhabitants in the area of circulation, but does not include a newspaper intended primarily for members of a particular profession or occupational group . . ." §§ 97.021, 163.3164, 165.031, and 171.031, Fla Stat. (2001). Similarly, <u>Black's Law Dictionary</u>, 1043 (6th ed. 1990), defines the term "newspaper" as "[a] publication, usually in sheet form, intended for general circulation, and published regularly at short intervals, containing information and editorials or current events and news of general interest."

Circulation does not have to be large, however, for a publication to be considered a newspaper. In <u>Quad-City Community News Servs., Inc. v. Jebens</u>, 334 F. Supp. 8, 11 (S.D. Iowa 1971), for example, the court found that an underground newspaper "hawked" on the city streets of Davenport, Iowa qualified as a newspaper, even though circulation was only between 600 and 1600 copies. Even though circulation was relatively low, the publication was considered a newspaper because it was widely available to the public.

Accordingly, a newsletter intended primarily for the membership of a specific organization or occupational group would not be considered a newspaper because it is not intended for general circulation to all inhabitants in the area within which it circulates. And, a person who writes or edits such a newsletter would not be considered a member of the print media.

Therefore, based on the foregoing, we are of the opinion that with respect to the media, the School Board may exclude from the press room any person who does not write or report for any publication or broadcast of general circulation that is readily available to all inhabitants in the area of circulation.

JOHNNY BROWN
Board Attorney

Prepared by:

TIMOTHY A. PEASE
Assistant Board Attorney

JB/tap

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

## 02-21932

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
United Teachers of Dade
Annette Katz

### DEFENDANTS
Merrett R. Stierheim, in his official capacity as Superintendent of Schools; School Board of Miami-Dade

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Dade 02cv-21932 (UUB) Brown

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert Rivas    850/412-0306
311 S. Calhoun St., Suite 206
Tallahassee, FL  32301

ATTORNEYS (IF KNOWN)
Johnny Brown    305/995-1304
School Board Attorney
1450 NE 2d Ave., Miami, FL  33132

### II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

### VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

42 U.S.C. § 1983, for defendants' violation of plaintiffs' First and Fourteenth Amendment rights, seeking declaratory relief and damages

### VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION** ☐ UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ YES   ☒ NO

### VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE                    DOCKET NUMBER

DATE   June 29, 2002

SIGNATURE OF ATTORNEY OF RECORD

$150.00   865254

**FOR OFFICE USE ONLY**

07/01/02

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____