UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 02-21932-CIV-UNGARO-BENAGES**

**Magistrate Judge Brown**

UNITED TEACHERS OF DADE,
a labor organization, and ANNETTE
KATZ,

      Plaintiffs,

v.

MERRETT R. STIERHEIM, in his
official capacity as Superintendent
of Miami-Dade County Public
Schools, and the SCHOOL BOARD
OF MIAMI-DADE COUNTY,

      Defendants.

_____/

NIGHT BOX
FILED

JUL - 2 2002

CLARENCE MADDOX
CLERK, USDC / S.D. / MIA

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND SUPPORTING MEMORANDUM OF LAW**

The plaintiffs, United Teachers of Dade ("UTD"), a labor organization, and

Annette Katz, individually and as an agent of UTD, pursuant to Fed. R. Civ P. 65(a),

move for the entry of a preliminary injunction against the defendant, Merrett R.

Stierheim, in his official capacity as Superintendent of Miami-Dade County Public

Schools, and in so moving state:

1.      This is an action for a declaratory judgment, temporary and permanent injunctive relief, and damages brought pursuant to 42 U.S.C. § 1983 to enforce rights secured to the plaintiffs by the First and Fourteenth Amendments to the United States Constitution.

2.      Plaintiff UTD, a teachers union, is publisher of *UTD Today*, a monthly newspaper.  Plaintiff Ms. Katz serves as editor and a reporter for *UTD Today*.  *See* Sworn Declaration of Annette Katz ("Katz Declaration"), attached to this motion as Exhibit 1, at ¶ 2.

3.      Defendant Mr. Stierheim is Superintendent of Miami-Dade County Public Schools.  *Id*. at ¶ 7.

4.      The School Board provides a press room to facilitate the news media's coverage of its meetings.  While in the press room the news reporters can hear and see the School Board meeting from behind large windows, while working where they can speak to their editors and others by telephone and use laptop computers without disturbing the people in attendance at the meeting.  *Id*. at ¶ 5.

5.      As editor and reporter for *UTD Today*, for more than two decades Ms. Katz has routinely made use of the School Board press room to cover meetings of the School Board of Miami-Dade County.  *Id*. at ¶ 6.

6.      *UTD Today* covers the School Board's activities intensively and is an important source of news and viewpoints about School Board issues for its 19,000

-2-

subscribers. It is circulated not only to UTD members, but also, without discrimination, to anyone who pays the subscription fee. *Id*. at ¶¶ 3, 4.

       7.     Mr. Stierheim has recently promulgated an administrative regulation to govern the use of the School Board press room. A copy of the regulation, along with a cover memorandum and the attachments to the regulation, is attached as Composite Exhibit A to both the Complaint and the Katz Declaration and is authenticated by the Katz Declaration. Katz Declaration at. ¶ 7. Pursuant to the regulation, effective on May 15, 2002, the use of the press room was prohibited to any news media representatives "who work for union publications." *See* Exhibit A to Complaint and Katz Declaration (see the second of the two May 14, 2002 memoranda, at the last line on its first page).

       8.     Pursuant to this provision, Ms. Katz has been prohibited from using the press room to cover School Board meetings for the first time in two decades. Katz Declaration at ¶ 8. She has been banished from the press room during regular monthly School Board meetings in May and June and two special meetings during the same period. *Id*. The School Board intends to enforce its discrimination against Ms. Katz and *UTD Today* at a meeting on July 10 and subsequent meetings. *Id*. at ¶¶ 9-11.

       9.     It is apparent that the School Board's policy was promulgated to discriminate against UTD in retaliation for UTD's opposition to the School Board and its administration on policy issues. *Id*. at ¶ 12. There is ample space and sufficient telephones for the reporters who regularly use the press room, including Ms. Katz, *id*. at

¶ 13, and the new School Board policy affects only Ms. Katz.  *Id.* at ¶ 14.

      10.    While nothing in the law requires the School Board to create a press room to facilitate the reporters in covering the School Board, in the event the School Board decides to provide such a facility, it may not discriminate against certain news reporters based on the content or viewpoint of their publications.  The School Board's policy of prohibiting news media representatives "who work for union publications" from the press room is a violation of the UTD's and Ms. Katz's First Amendment right to freedom of speech and of the press, as applied to the School Board of Miami-Dade County by the Fourteenth Amendment, and their Fourteenth Amendment rights to due process and the equal protection of the laws.  The School Board's new policy would not survive either a facial or as-applied challenge.

      WHEREFORE, the plaintiffs move for the entry of a preliminary injunction prohibiting Mr. Stierheim from enforcing the School Board's policy of prohibiting news reporters "who work for union publications" from the School Board press room with respect to Ms. Katz or any other reporter for *UTD Today.*

## MEMORANDUM OF LAW

      Pursuant to S.D. Fla. L.R. 7.1.C., the plaintiffs submit the following memorandum of law in support of this motion.

## I. PRELIMINARY INJUNCTION STANDARD

In order to satisfy the requirements for a preliminary injunction, the plaintiffs

-4-

"must establish: (1) a substantial likelihood of succeeding on the merits; (2) a substantial threat of irreparable injury if relief is denied; (3) an injury that outweighs the opponent's potential injury if relief is granted; and (4) an injunction would not harm the public interest." *Gold Coast Publications, Inc. v. Corrigan*, 42 F.3d 1336, 1343 (11th Cir. 1994), *cert. denied*, 516 U.S. 931 (1995).  At the outset, the plaintiffs will first address the second, third and fourth of these elements, because the first element, the likelihood of success on the merits, is the only one the defendants are likely to deny that the plaintiffs have met.

As for irreparable injury, the threat that Ms. Katz will be excluded from the press room is real and imminent.  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Next, the injury UTD and Ms. Katz will suffer easily outweighs any potential injury a preliminary injunction might cause the School Board.  Ms. Katz has covered meetings from the press room for 20 years.  It would do no harm to the School Board, not even a minor inconvenience, for Ms. Katz to be allowed to use the press room during the pendency of these proceedings.

Finally, the public interest would not be harmed if the School Board were enjoined to allow Ms. Katz to use the press room. The School Board surely will not contend that the public interest was harmed during the last 20 years by Ms. Katz's use of the press room.  Ms. Katz, or an alternative representative of *UTD Today*, will be

providing information about School Board activities for thousands of *UTD Today*

readers who are particularly interested in the School Board's activities.

In this case, as was the case in *Corrigan*, "the issuance of a preliminary injunction

in the context of free speech turns solely on whether the challenged ordinance violates

the First Amendment." 42 F.3d at 1343.  This is so, in part, because whether the injury

is irreparable depends on whether the First Amendment is violated by the policy, a

question addressed in the analysis of the movant's likelihood of success on the merits;

and so does the question of whether the public interest is served by the injunction.

In sum, the legal analysis of whether to grant a preliminary injunction depends on

the plaintiffs' likelihood of success on the merits of their argument that, as a matter of

law, the School Board's regulation is prohibited by the First Amendment.  The other

elements converge on this element.

## II.  LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  IN PROVIDING A PRESS ROOM, THE GOVERNMENT MAY NOT DISCRIMINATE BETWEEN NEWS MEDIA BASED ON THEIR CONTENT.

When the government discriminates against a newspaper because it is a "union

publication," or because it is "intended primarily for members of a particular profession

or occupation," as the School Board is doing in this case, the government is

discriminating on the basis of the newspaper's viewpoint.  Yet,

It is axiomatic that the government may not regulate speech based

-6-

on its substantive content or the message it conveys. ... Other principles
follow from this precept. In the realm of private speech or expression,
government regulation may not favor one speaker over another. ...
Discrimination against speech because of its message is presumed to be
unconstitutional. ... [T]he government offends the First Amendment when
it imposes financial burdens on certain speakers based on the content of
their expression. ... When the government targets not subject matter, but
particular views taken by speakers on a subject, the violation of the First
Amendment is all the more blatant. ... Viewpoint discrimination is thus an
egregious form of content discrimination. The government must abstain
from regulating speech when the specific motivating ideology or the
opinion or perspective of the speaker is the rationale for the restriction.

*Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 828-829

(1995) (citations omitted). The School Board's new policy explicitly discriminates

against Ms. Katz and *UTD Today* based on their viewpoint. A line of lower court cases

has applied the *Rosenberger* principle in a more narrowly focused setting not materially

distinguishable from the instant case:

While it is perfectly true that reporters do not have an unrestricted right to
go where they please in search of news, ... the elimination of some
reporters from an area which has been voluntarily opened to other reporters
for the purpose of news gathering presents a wholly different situation.
Access to news, if unreasonably or arbitrarily denied ... , constitutes a direct
limitation upon the content of news ...

*Consumers Union of United States, Inc. v. Periodical Correspondents' Assoc.*, 365 F.

Supp. 18, 25-26 (D.D.C. 1973) (citations omitted) (holding it was unconstitutional for

Congress to discriminate against *Consumer Reports* in providing press room facilities to

other magazines), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975), *cert. denied*,

423 U.S. 1051 (1976). *See also ABC, Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir.

1977) (granting a federal injunction to restrain state court prosecution for "trespassing" because "once there is ... participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable"); *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) ("arbitrary or content-based criteria for press pass issuance are prohibited under the [F]irst [A]mendment").   In *Consumers Union*, the court also said:

> A free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint.   This is a dangerous and self-defeating doctrine.

*Consumers Union*, 365 F. Supp. at 25.   Although *Consumers Union* was vacated based on the political question doctrine, *Consumers Union*, 515 F.2d at 1347, the trial court's holding on the merits in *Consumers Union* has been repeatedly approved and applied where the political question doctrine was not a bar.   *See, e.g., Lewis v. Baxley*, 368 F. Supp. 768, 776-777 (M.D. Ala. 1973).   Even the U.S. Circuit Court for the District of Columbia, the court that vacated *Consumers Union* as a non-justiciable political question, subsequently endorsed its holding on the merits.   *Sherrill*, 569 F.2d at 129 n.17.

The government must demonstrate a "compelling" interest to support any form of discrimination against a content-based classification of news media in terms of access to facilities otherwise open to news media, and must advance that governmental interest by a means that is no more restrictive than is reasonably necessary.   *Consumers Union*, 365 F. Supp. at 25; *Lewis*, 368 F. Supp. at 778-779 ("the state must show a 'substantial'

-8-

nexus [between the chosen means and a compelling governmental interest] when it seeks to exclude one or more members of the press from areas or occasions to which other members of the press are admitted, such as press rooms or press conferences"); *Borreca v. Fasi*, 369 F. Supp. 906, 908-909 (D. Hawaii 1974).

It is manifestly not a "compelling" interest for the government to discriminate between news media on the basis of the content of the publication. *E.g.*, *Lewis*, 368 F. Supp. at 779; *Borreca*, 369 F. Supp. at 910. Thus, the only justification for the School Board's policy -- a desire to discriminate against a news medium that is oriented toward a particular interest group, i.e., the teacher's union's members and supporters -- is not only not a "compelling" interest, but is "an interest with which the government may not constitutionally concern itself at all." *Lewis*, 368 F. Supp. at 779. The School Board's discriminatory policy could not even pass a rational basis test, and therefore violates the plaintiffs' right to the equal protection of the laws, in addition to its violation of the plaintiffs' First Amendment rights.

### B. THERE IS NO MERIT TO THE SCHOOL BOARD'S APPARENT BELIEF THAT SOME STATE STATUTE APPROVES THE PRACTICE OF SUCH DISCRIMINATION.

Evidently, the School Board believes it can support the policy of discriminating against union publications based on the theory that it can lawfully discriminate against a news medium "intended primarily for members of a particular profession or occupation," as the May 14, 1002 memorandum says:

State statutes generally define working media as individuals employed by a newspaper or broadcast organization intended for general circulation. It does not include a newspaper intended primarily for members of a particular profession or occupation.

To the contrary, there is no state statute that prescribes content-based discrimination against a category of news media in a context similar to this one. This statement in the May 14 memorandum is based on an attached February 5, 2002 legal opinion. The February 5 legal opinion generally supports the plaintiffs' position.

However, one part of the February 5 legal opinion's analysis states that "a newsletter intended primarily for the membership of a specific organization or occupational group would not be considered a newspaper because it is not intended for general circulation to all inhabitants in the area within which it circulates." The legal opinion supports this statement by citations to sections 97.021, 163.3164, 165.031, and 171.031 of the Florida Statutes. A review of those statutes shows that they are totally irrelevant to the proposition they are being cited to support.

Each of the cited statutes contains a provision defining what type of newspaper the state must use when the state is publishing a legal notice. Accordingly, each of these statutes controls a circumstance where the government is speaking, not regulating the speech of others. Common sense says that if the government need purchase a legal advertisement, the purpose of which is to provide the widest possible distribution of a public notification, the government may ordain that the advertisements be published in general interest publications. In this context, it does not violate anyone else's

-10-

constitutional rights for the government to select publications that are not intended for a particular profession or occupation. One of the cited statutes, for instance, says:

> "Newspaper of general circulation" means a newspaper printed in the language most commonly spoken in the area within which it circulates and which is readily available for purchase by all inhabitants in the area of circulation, but does not include a newspaper intended primarily for members of a particular professional or occupational group, a newspaper the primary function of which is to carry legal notices, or a newspaper that is given away primarily to distribute advertising.

§ 97.021(15), Fla. Stat. (2001). This provision is in the "definitions" section of the Elections Code, and it controls where, for instance, notices of special elections and referenda are published. *See* §§ 100.141, 100.342, Fla. Stat. (2001). It is obvious that the definition is intended not to discriminate against any news medium based on its viewpoint, but to limit the qualified newspapers to those that will reach a large audience, consistent with the basic purpose of the legal notices.

For instance, these statutes prohibit publishing legal notices in newspapers intended primarily to "carry legal notices" or "to distribute advertising," which is to say, newspapers that relatively few people actually read. An identical definition of "newspaper of general circulation" is found in statutes controlling the government's publication of notices regarding a county's comprehensive land use plan, § 163.3164; and notices regarding incorporation and dissolution of municipal governments and special taxing districts, §§ 165.031 and 171.031.

These statutes have nothing to do with whether the government may discriminate

-11-

against "a newspaper intended primarily for members of a particular professional or occupational group" when the government is acting in the role of regulating access to a government-sponsored press room. The School Board has cited no statute that supports its position in any way.

### C.  THERE IS NO MERIT TO THE SCHOOL BOARD'S APPARENT BELIEF THAT THE *UTD TODAY* IS NOT "ACCREDITED" IN SOME SENSE.

The School Board seems to rely on a definition of "accredited news gatherers" that somehow excludes *UTD Today* and its reporter. There is no such definition relevant to any legal justification for the School Board to prohibit "union publications" from its press room.

The May 14 memorandum refers to "the legal guidance the courts have presented in regards to *accredited news gatherers*," emphasis in original, in a context implying that a "union publication" reporter may be legally excluded from the definition of an "accredited news gatherer" based on certain "case law." There is no support in any cited case for this proposition.

Where the memorandum refers to a news medium being "accredited," the cases use that term only when the government agency has promulgated a list of the news media the agency has "accredited," as in *Consumers Union*, 365 F. Supp. at 21, where the Congress "accredited" periodicals to use the congressional press facilities. When the

-12-

agency itself gives the "accreditation," it is circular to say a news medium is prohibited if it is "not accredited," because whether a news medium is accredited is a decision the agency makes in the first place.  This case challenges whether the School Board may lawfully deny accreditation to *UTD Today*.

But the May 14 memorandum really seems to be implying something else, giving an inexplicable significance to whether a reporter is "accredited."  There is no general system of "accrediting" news media in this country.  In common parlance, a reporter is "accredited" if he or she has an ID card promulgated by the news medium the reporter works for.  *See, e.g.*, Katz Declaration at ¶ 15.  Ms. Katz has such an ID card.  *Id.*  It has no more or less legal significance than a Miami Herald reporter's ID card.   Indeed, she has three press cards. *Id.*

In another context, there is authority for a police agency to issue a "press pass" for the purpose of identifying reporters at a crime or disaster scene so that police may allow them closer access than the rest of the public, as described in one of the cases cited in the School Board's February 5 legal opinion, *Quad-City Community News Service, Inc. v. Jebens*, 334 F. Supp. 8, 12 (S.D. Iowa 1971).  Perhaps the School Board thinks a reporter with a "press pass" is an "accredited news gatherer."  But *Jebens* itself is one of the many cases holding that, in issuing "press passes," the police agency may not discriminate

against a news medium based on its content. *Id*. at 13-14.

In sum, there is no support for any suggestion that Ms. Katz is not an "accredited news gatherer."

### D. ON THE EXISTING RECORD, THE SCHOOL BOARD COULD NOT DISCRIMINATE AGAINST MS. KATZ OR *UTD TODAY* BASED ON ANY SPECIFIC OBJECTION TO EITHER OF THEM.

Finally, at the risk of arguing a point that need not be argued, neither Ms. Katz nor *UTD Today* may be prohibited from the press room based on any past conduct of either of them that is allegedly inconsistent with the intended purposes of the press room. Any School Board policy governing the use of the press room would have to "be so fashioned that due process is provided prior to exclusion, with opportunity for adequate impartial review whenever a publication is excluded." *Consumers Union*, 365 F. Supp. at 27; *see also Sherrill*, 569 F.2d at 128.   The School Board has promulgated no such policy, nor have Ms. Katz and *UTD Today* been given notice and an opportunity to be heard on any charges.

### III.  CONCLUSION

Therefore, this motion for a preliminary injunction should be granted, preferably in advance of July 10, and as soon as practicable thereafter if not by July 10.  If the School Board does not waive its right to a bond, the bond should be nominal, inasmuch

-14-

as no conceivable economic harm result come from the injunction.

Respectfully submitted,

Robert Rivas
The Rivas Law Firm
311 S. Calhoun St., Suite 206
Tallahassee, FL 32301-1802
*Tel:* (850) 412-0306
*Fax:* (850) 412-0909
Florida Bar No. 896969
RobRivas@aol.com

**I HEREBY CERTIFY** that on July 2, 2002, I served a copy of this motion and its attached declaration by fax and by priority Federal Express (for morning delivery) on counsel for both of the defendants as follows: School Board Attorney's Office, Attn.: Hector James Montalvo, 1450 N.E. 2nd Ave., Room 400, Miami, FL 33132-1308.

Robert Rivas

-15-

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 02-21932-CIV-UNGARO-BENAGES**

**Magistrate Judge Brown**

UNITED TEACHERS OF DADE,
a labor organization, and ANNETTE
KATZ,

      Plaintiffs,

v.

MERRETT R. STIERHEIM, in his
official capacity as Superintendent
of Miami-Dade County Public
Schools, and the SCHOOL BOARD
OF MIAMI-DADE COUNTY,

      Defendants.

_____/

**SWORN DECLARATION OF ANNETTE KATZ
IN SUPPORT OF PRELIMINARY INJUNCTION**

State of Florida        )

County of Miami-Dade    )

      I, Annette Katz, under penalties of perjury pursuant to Florida Statutes section

92.525, swear as follows:

1.    I am a plaintiff in this action.  I give this written testimony based on my own personal knowledge.

2.    As an employee of the United Teachers of Dade ("UTD"), a teachers' union, I am the editor of *UTD Today*, and often serve as a reporter for the publication.

3.    *UTD Today*, a tabloid-format newspaper, is circulated to nearly 19,000 people, including all the members of the UTD, and many other individuals to whom the UTD sends free subscriptions.  In addition, the *UTD Today* is available without discrimination to anyone who pays a $5 annual subscription fee.  A copy of *UTD Today's* masthead, with an invitation for members of the public to subscribe, is attached as Exhibit B.  This information is published in every issue.

4.    *UTD Today* is devoted broadly to coverage of Miami-Dade County Public Schools, including, as one key component of its coverage, extensive reporting on public policy issues pending before the School Board for resolution, with an even more particular focus on issues of concern to the UTD.  The UTD is regularly in an adversarial position with the School Board and its administration in regard to particular issues, particularly the wages and terms of employment of teachers and other members of the UTD collective bargaining unit.

5.    The School Board provides a press room to facilitate the news media's coverage of its meetings.  While in the press room the news reporters can hear and see the School Board meeting from behind large windows, while working where they can

-2-

speak to their editors and others by telephone and use laptop computers without disturbing the people in attendance at the meeting.

6.    As editor and reporter for *UTD Today*, for more than two decades I have routinely made use of the School Board press room to cover meetings of the School Board of Miami-Dade County.

7.    Merrett R. Stierheim, the Superintendent of Miami-Dade Public Schools, has recently promulgated an administrative regulation to govern the use of the School Board press room. A copy of the regulation, along with a cover memorandum to the School Board members and the attachments to the regulation, is attached to this declaration as Composite Exhibit A.

8.    Effective on May 15, 2002, the regulation prohibits any news media representatives "who work for union publications" from using the press room. Based on this regulation, I was prohibited from using the press room during regular monthly School Board meetings in May and June and two special meetings during the same period.

9.    On June 7, 2002, our attorney and I met with one of the School Board's attorneys, Patricia D. Bass, and the School Board's "Communications Executive Officer," Mayco Villafaña, who is in charge of the press room, to provide them with support for our view that it is an unconstitutional violation of my and UTD's First and Fourteenth Amendment rights for the School Board to banish me from the press room in

this manner, and to ask that the School Board's new policy be reconsidered.  They took our position under advisement and assured our attorney and me that they would let us know if the School Board administration decided to rescind its prohibition on my use of the press room.

10.    At the June 7 meeting, and in other communications, our attorney and I asked the School Board to rescind its new policy or amend the policy in time for me to use the press room during a School Board meeting on June 19, 2002, or at least to suspend my banishment from the press room temporarily while the matter was reconsidered.  We told these School Board employees we would refrain from filing this legal proceeding if only they would allow me to use the press room temporarily while they reconsidered the School Board's new policy.

11.    The School Board rejected this offer and continued its prohibition on my use of the press room during the School Board's June 19, 2002 meeting.  As of this date the School Board continues to inform us that its policy of prohibiting reporters "who work for union publications" from using the press room remains in effect.  As of this date the School Board refuses to revoke, amend, or even temporarily suspended my banishment from the press room for the upcoming July 10, 2002 meeting.  I wish to cover that meeting and make use of the press room, or send another *UTD Today* reporter to do so in my stead.  I wish to cover all future School Board meetings and make use of the press room, or send another *UTD Today* reporter to do so in my stead.

-4-

12. It is obvious to me that the School Board's policy can be explained only as discrimination animated by the School Board's resentment of the UTD's adversarial stance on policy issues, and *UTD Today's* editorial support for the UTD's stance.

13. There is ample work space and sufficient telephones in the press room for all the reporters who wish to work there normally. No shortage of work space or telephones impels the School Board to need to trim the number of reporters who make use of the press room.

14. I am thoroughly familiar with the identities of the other reporters who use the press room. To the best of my knowledge, there is no other reporter, and no other publication, that is prohibited from using the press room based on the School Board's new policy. Although Mr. Villafaña's May 14, 2002 memorandum, countersigned by Mr. Stierheim, refers to the possibility of excluding reporters for "a newspaper intended primarily for members of a particular profession or occupation," there is no news medium that fits that description attempting to use the press room, except to the extent *UTD Today* is "a newspaper intended primarily for members of a particular profession or occupation." In practice, the memorandum's subsequent reference to a prohibition against the use of the press room by "those who work for union publications" is a reference to me alone.

15. The Court should not be misled by the May 14 memorandum's reference to

"accredited news gatherers." The School Board does not "accredit" news reporters. The memo implies that the phrase "accredited news gatherers" includes certain reporters and excludes "those who work for union publications." There is no such definition, except inasmuch as the School Board made one up in drafting this policy. Generally, a reporter is "accredited" by his or her own news organization, which means nothing more than to say that the news medium gives the reporter some form of identification. For instance, a Miami Herald reporter has a laminated picture ID card identifying him or her as a Miami Herald reporter. I, too, have a press pass "accrediting" me as a reporter for *UTD Today*. A copy of this press credential is attached to this declaration as Exhibit C. *UTD Today* issues a similar press credential to all of its reporters. I have two other types of "press credentials" as well. Copies of them are attached to this declaration as Exhibit D.

16.     The Court should not be misled by the two letters attached to the May 14 memorandum, where they refer to Pat L. Tornillo, Jr., the president of UTD, being present in the press room. Mr. Villafaña admitted to me that he solicited those letters. In any event, they are of no consequence to the issues in this lawsuit, because they are referring to the era when, until recently, access to the press room was not restricted to news reporters. At that time (for all the years prior to 2001-2002), Mr. Tornillo did use the press room, but so did School Board administrative employees and others, as a

-6-

gathering place, and for countless other purposes unrelated to news reporting. Far more School Board administrative employees than UTD officers used the room in that manner. In March of 2002, Mr. Stierheim informed Mr. Tornillo that the press room is now being restricted to reporters, and Mr. Tornillo fully respects the new policy. Immediately upon being told that the press room, for the first time, was being restricted to reporters, the UTD instituted a policy and practice of not allowing any UTD employee to enter the press room except those covering the School Board meeting for *UTD Today*.

17.    There is one other "red herring" issue I should mention. The attachments to the May 14 memorandum might suggest that there is some inconsistency between my being a news reporter and my being a union employee. It is true that I wear two hats, one as the editor of *UTD Today* and one as the UTD's communications director. When wearing the latter hat, I provide reporters with information about the UTD and its position on policy issues, and comment on the record on behalf of the UTD. However, nothing I do in the press room is inconsistent with the School Board's policy on the use of the press room. Mr. Stierheim's May 14 memorandum itself provides:

> It is the prerogative of any member of the working media to call any individual into the press room who is not a member of the working media as long as the purpose is for a quick interview or a brief clarification of a newsworthy issue. If the interview will be lengthy, reporters will be asked to conduct the interview outside of the press room.

My conduct in the press room has been, and will continue to be, in keeping with this policy whenever a reporter wishes to ask me to answer a question on behalf of UTD.

When acting as a reporter in the press room, I do not solicit or initiate discussions with

the other reporters in an effort to influence their views about the UTD's issues.


     Under penalties of perjury, I declare that I have read the foregoing document and
that the facts stated in it are true.

     Signed on July 1, 2002.


*Annette Katz*

Annette Katz

**M E M O R A N D U M**                                  May 14, 2002

TO:         The Honorable Chair and Members of The School Board of Miami
            Dade County, Florida

FROM:       Merrett R. Stierheim
            Superintendent of Schools

SUBJECT:    **NEW PRESS ROOM PROCEDURES**


For your information, I am transmitting to you new press room procedures that will be in
place starting with the May 15, 2002 Board meeting.  If you have any questions, please
refer them to Communications Executive Officer Mayco Villafaña at (305) 995-4638.


MRS:ebm
M-1743
Attachments

cc:         Superintendent's Executive Staff
            School Board Attorney








# Composite Exhibit A

**MEMORANDUM**                                                      May 14, 2002

TO:          Mr. Merrett R. Stierheim
             Superintendent of Schools

FROM:        Mayco Villafaña
             Communications Executive Officer

**SUBJECT:   PRESS ROOM PROCEDURES**

As you know, the Office of Public Relations oversees a press room located in the auditorium of the School Board Administrative Building (SBAB). Soon after coming on board, I began a review of press room utilization and heard from reporters and M-DCPS public relations staff regarding the lack of procedures governing the use of the press room. I am attaching letters that address some of the media's concerns. In general, press rooms provide reporters an area having desks, phones and chairs (nowadays even Internet connections) from where they can electronically transmit their news stories to their newsrooms or confer with their editors via phone. Reporters want a press room unfettered from any undue influence. Other major school systems nationwide have procedures in place to manage media access to school board meetings. I am attaching a memorandum detailing some of the procedures used by other school districts.

Starting with the May 15th Miami-Dade County School Board meeting, the Office of Public Relations will restrict access to the press room to working media representatives. State statutes generally define working media as individuals employed by a newspaper or broadcast organization intended for general circulation. It does not include a newspaper intended primarily for members of a particular profession or occupation. I am attaching a memorandum from the School Board Attorney dated February 5, 2002, regarding the use of a press room. It provides case law indicating the authority of a public board to establish a room for the use of the press as well as the legal guidance the courts have presented in regards to *accredited news gatherers*.

Individuals who do not meet the above requirements of *accredited news gatherers* will be denied access to the press room. For example, no one employed by the School Board or the School District (except members of the Office of Public Relations and employees who service the room) may have access to the press room. In addition anyone having business before the School Board, addressing the Board, or attempting to influence School District policies will not be allowed in the press room. This includes any and all MDCPS employees working in the district office or any of its regional offices, schools or satellite facilities. This includes, but it is not limited to vendors, lobbyists, their clients and/or their legal representatives, union members or anyone employed by the various labor unions in any capacity including those who work for union publications. Members

of the public attending School Board meetings, regardless of whether they sign to speak before the School Board or not, will not be permitted to enter the press room.

It is the prerogative of any member of the working media to call any individual into the press room who is not a member of the working media as long as the purpose is for a quick interview or a brief clarification of a newsworthy issue.  If the interview will be lengthy, reporters will be asked to conduct the interview outside of the press room. Working members of the media are prohibited from inviting friends, associates or anyone not connected with a news assignment from being in the press room at any time.

These rules will apply to any and all official sunshine meetings of the Miami-Dade County School Board taking place in the SBAB auditorium.

Through this memorandum I am asking that you recognize these new procedures as an administrative directive.

_____ MV

MV:ebm
M-808

Attachments

Approved: _____
Merrett R. Stierheim

# W P L G / T V 1 0

2002 APR 17 PM 4:15  A POST-NEWSWEEK STATION

OFFICE OF PUBLIC INFORMATION
AND MEDIA RELATIONS

April 11, 2002

Mayco Villafana
Miami-Dade County Public Schools
Public Information Office

Dear Mayco,

I'm writing to make you aware of the many issues involving the **PRESS ROOM** at the Miami-Dade Public School Auditorium. Realizing that you are new to the district operations, and the Press Room was at the center of a controversy at last month's meeting, I wanted to fill you in on what's been happening in there for the last two years.

The Press Room was where at least three UTD officials always sat... Pat Tornillo, Merri Mann and Annette Katz. They usually got there very early and took up the best seats in the room. Reporters were often forced to sit and take notes on their lap or try to balance their computer on their lap because there was no desk space for them. In addition, UTD used the Press Room as a staging area for their organized protests. Often this involved other unions and other union bosses. They would all congregate in there, talk loud, crowd the room and take up seating for the press. This has been somewhat resolved since the district informed Mr. Tornillo that only the media would be allowed in the room.

Annette Katz continues to sit in the press room as UTD's representative. Her presence however, is very troubling for a number of reasons. Her union is increasingly the subject of media reports. I have never been in another Press Room where subjects of media reports shared space with the media. As a result of her easy access to the media, Mrs. Katz uses her presence to lobby the union's point of view on a variety of issues. Not a problem, except that's not the purpose of that room.

She has verbally attacked me and other reporters when we've done stories she or UTD did not like. She frequently editorializes and often maligns Superintendent Stierheim and certain board members. While I respect her right to free speech and I'm more than capable of fighting back when attacked... it is not the work

environment any member of the media should have to deal with when they enter a "working" Press Room. We go there to do our work, not trade verbal barbs with Mrs. Katz. I have even been forced to ask her to step outside to continue her attack so as not to interrupt the work of other reporters.

While I realize that it is the School Board's Press Room and you can give access as you see fit... I hope you'll consider the ongoing ramifications of non media members being present in that room. Any message a board member or Superintendent or union or the public wants to get across to the media, should be done in the public forum of the public school board meeting. They can even ask for side conversations outside, as most already do.

Please be clear, this is not just a UTD problem. There is one board aide who frequently camps out in there. Several top administrators come in to sit, nap, eat cookies and generally hang out. In fact, the district's Press Room was little more than a party room for a long time, since, as I believe, the media was rarely there. That has changed and we are not going to disappear. I urge you to either create and enforce a professional "working" Press Room or abandon the idea of having one at all. At least the members of the press corps will know what to expect.

Very Sincerely,

Jilda Unruh
Investigative Reporter
(o) 305-325-2435
(fax) 305-325-2335
(e-mail) junruh@click10.com

# The Miami Herald

www.herald.com

Mr. Mayco Villafana
Communications Executive Officer
Miami-Dade County Public Schools

April 15, 2002

Dear Mayco:

I would like to call your attention to a situation occurring at monthly
School Board meetings that might be inappropriate:

Members of the United Teachers of Dade staff, including communications
director Annette Katz and occasionally president Pat Tornillo, encamp
themselves in the press room during meetings, at which important
decisions are made that directly affect the UTD.

Ms. Katz, Mr. Tornillo and other union officials are decent folks, and my
concern is not personal. But I believe reporters need to be unfettered as
they report and write their stories, some of which include the UTD.

I will support whatever manner you feel is appropriate to handle this
situation.

Regards,

Bob Radziewicz
Education Editor
The Miami Herald

305-375-3506
bradziewicz@herald.com

One Herald Plaza, Miami, FL  33132-1693

⟩KNIGHT RIDDER⟨

MEMORANDUM                                                    May 14, 2002

TO:        Mayco Villafaña, Communications Executive Officer
           Office of Public Relations

FROM:      John Schuster, Supervisor
           Office of Public Relations

**SUBJECT:   PRESS ROOM USAGE**

Following are notes regarding press room usage in selected school districts.

BROWARD COUNTY, FLORIDA

1. An area is set aside in the back of the school board auditorium for television cameras.  A table is available for newspaper reporters.  Signs designate "press only."

2. The area is for use by credentialed reporters only.

3. Community Relations personnel are available to facilitate retrieving documents, if needed.

4. Reporters can meet with school or union officials outside the school board chambers if they choose to, but not in the press area.

ORANGE COUNTY, FLORIDA

1. No designated area is set aside for the media. Reporters are welcome to sit in the auditorium with everyone else.  There is a break-out box for electronics to get audio feeds.

2. Community Relations personnel are familiar with reporters and know them by name.  Many wear their own I.D.'s designating them as media.

3. Reporters who wish to meet with school or union officials may do so in the auditorium after the meeting or in the lobby during the meeting.

CHICAGO PUBLIC SCHOOLS, CHICAGO, ILLINOIS

1. No separate press area.  Media representatives check in on the ground floor with security and are escorted to the fifth floor school board meetings.

2. The first row in the auditorium is set aside for reporters. TV cameras must stay to the side aisles.

3. Reporters bring their own company-issued credentials.  Community Relations personnel are

familiar with the reporters, usually.

4. Reporters who wish to interview school or union officials do so outside the school board chambers.


## NEW YORK CITY CENTRAL BOARD OF EDUCATION, NEW YORK

1. The school board meets in a formal board meeting type room. There is no designated press area.

2. Media representatives sit in the audience.  TV cameras are placed to the sides.

3. Public information personnel generally know the education reporters and do not have to ask for credentials.

4.  If a reporter wishes to speak with school or union officials, they generally do so outside the meeting room.


## LOS ANGELES UNIFIED SCHOOL DISTRICT, LOS ANGELES, CALIFORNIA

1. A press room is located across the hallway from the school board chambers. Media representatives can view the proceedings via closed-circuit TV.  They have phone lines to plug in their laptops.  Reporters may also sit in the auditorium.

2. The room is open only to members of the media.

3. Media representatives wear identification issued by the media outlet.

4. Media representatives who wish to ask a union representative for their reactions or thoughts may do so in the hallway, but not in the press room.

**M E M O R A N D U M**                                        February 5, 2002

TO:        Mr. Merret R. Stierheim
           Superintendent of Schools

FROM:      Attorney's Office

**SUBJECT:   REQUEST FOR LEGAL OPINION REGARDING USE OF PRESS ROOM**

This is in response to your request for a legal opinion submitted by memorandum dated January 18, 2002. (copy attached). You have indicated that a sign on the press room door in the School Board Administration Building auditorium states, "Due to capacity constraints, use of the press room will be reserved for credentialed members of the media and appropriate M-DCPS staff." You asked for an opinion addressing "who may use and who may be excluded from using the [press] room, as well as what constitutes media credentials."

Although meetings must be open to the public, a public board or commission can set aside an area for members of the press. See e.g. Westinghouse Broad. Co. Inc. v. Dukakis, 409 F. Supp. 895 (D. Mass. 1976) (Boston City Council provides a specific section of the chamber floor for the press, which has electrical outlets and other conveniences); Consumers Union of U.S., Inc. v. Periodical Correspondence Ass'n., 365 F. Supp. 18 (D.D.C. 1973) (Senate and House press galleries not open to general public). Therefore, as an initial matter, the School Board has the authority to establish a room for the exclusive use of members of the press.

However, once a press room is established, the School Board must give all members of the press equal access. Under the First Amendment, press organizations have a limited right of access to newsworthy events in their capacity as representatives of the public and on their own behalf as members of the press. WPIX v. League of Women Voters, 595 F. Supp. 1484 (S.D.N.Y. 1984). Once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media. American Broad. Co., Inc. v. Cuomo, 570 F.2d 1081, 1083; see also, Cable News Network v. American Broad. Co., Inc., 518 F.Supp. 1238, 1245 (enjoining White House from excluding all television press while admitting *members* of the print media); Westinghouse Broad. Co., Inc. v. Dukakis, 409 F. Supp. 895, 896 (opportunity to cover official news sources must be the same for all *accredited* news gatherers).

Mr. Merret R. Stierheim

February 5, 2002
Page 2

While these cases do not define who is a "member" of the media or an "accredited news gatherer," state statutes through definition of "newspaper" provide guidance as to what constitutes the media. For example, with respect to newspapers, state statutes requiring publication of official notices and the like in a "newspaper of general circulation" have defined that phrase as "a newspaper printed in the language most commonly spoken in the area within which it circulates and which is readily available for purchase by all inhabitants in the area of circulation, but does not include a newspaper intended primarily for members of a particular profession or occupational group . . ." §§ 97.021, 163.3164, 165.031, and 171.031, Fla Stat. (2001). Similarly, Black's Law Dictionary, 1043 (6th ed. 1990), defines the term "newspaper" as "[a] publication, usually in sheet form, intended for general circulation, and published regularly at short intervals, containing information and editorials or current events and news of general interest."

Circulation does not have to be large, however, for a publication to be considered a newspaper. In Quad-City Community News Servs., Inc. v. Jebens, 334 F. Supp. 8, 11 (S.D. Iowa 1971), for example, the court found that an underground newspaper "hawked" on the city streets of Davenport, Iowa qualified as a newspaper, even though circulation was only between 600 and 1600 copies. Even though circulation was relatively low, the publication was considered a newspaper because it was widely available to the public.

Accordingly, a newsletter intended primarily for the membership of a specific organization or occupational group would not be considered a newspaper because it is not intended for general circulation to all inhabitants in the area within which it circulates. And, a person who writes or edits such a newsletter would not be considered a member of the print media.

Therefore, based on the foregoing, we are of the opinion that with respect to the media, the School Board may exclude from the press room any person who does not write or report for any publication or broadcast of general circulation that is readily available to all inhabitants in the area of circulation.

JOHNNY BROWN
Board Attorney

**Prepared by:**

TIMOTHY A. PEASE
Assistant Board Attorney

JB/tap

 UTD TODAY

Annette Katz
*Editor*

Madeline Loepz
*Managing Editor*

Terry Hann
*Art Director*

Charmaine Haithcock
*Proofreader*

Ellis Berger
*Special Assignment Reporter*

John Birk
*Contributing Photographer*

*Contributors:*
Sal Antezana
Bronwyn Beightol
Government Relations Department
Member & Contract
  Services Department
Retired Teachers Chapter
Barbara R. Salvin

 ILCA

 EdPress

9

*Printed on recycled paper*

Contributions and comments are welcomed. Mail them to UTD,Communications Dept., 2200 Biscayne Blvd., Miami, FL 33137 or e-mail Maddie@utofd.com

Pat Tornillo
*President*

Shirley B. Johnson, Ph.D.
*Secretary/Treasurer*

Subscriptions included in the dues of UTD members. To others, $5 per year. *UTD TODAY* cannot accept responsibility for unsolicited manuscripts. Member, Educational Press Association of America, International Labor Communications Association, Union Teachers Communications Association. Printing done in 100% union shop by members of the CWA Local 3121, AFL-CIO, CLC Label 9. Affiliations: Florida Education Association, American Federation of Teachers, National Education Assoc., American Federation of Labor-Congress of Industrial Organizations. The *UTD TODAY* is a publication of the United Teachers of Dade.

# Exhibit B



**Exhibit C**



# Exhibit D