UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-21932-CIV-UNGARO-BENAGES
Magistrate Judge Brown

UNITED TEACHERS OF DADE , a labor
organization, and ANNETTE KATZ,

        Plaintiffs,

v.

MERRETT R. STIERHEIM, in his official
capacity as Superintendent of Miami-Dade
County Public Schools, and THE SCHOOL
BOARD OF MIAMI-DADE COUNTY,

        Defendants.

_____/



### DEFENDANTS RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

    Defendants, Merrett R. Stierheim and The School Board of Miami-Dade County, (hereinafter "Defendants" or "School Board"), by and through undersigned counsel, and pursuant to S.D.Fla.L.R. 7.1C, hereby file their response memorandum to Plaintiffs' motion for preliminary injunction, and as grounds state as follows:

    1.    On July 1, 2002, Plaintiffs filed a complaint alleging violations of their First Amendment rights seeking injunctive relief and damages pursuant to 42 U.S.C. § 1983.

    2.    On July 3, 2002, Plaintiffs filed a motion for preliminary injunction requesting that the Court enter an order requiring Defendants to allow Plaintiffs into the press room in order for Plaintiffs to be able to cover the School Board meeting on July 10, 2002, "or as soon as practicable thereafter."



<u>United Teachers of Dade, et. al. v. Miami-Dade County School Board, et al.</u>
U.S.D.C. Case No. 02-21932 CIV-Ungaro Benages

3.     For the reasons that follow, this Honorable Court should deny Plaintiffs' motion because Plaintiffs are not being denied access to any information. Accordingly, Plaintiffs' First Amendment rights to having "access to information" are not implicated here. The Court is respectfully referred to the memorandum in support of this response that follows. Furthermore, Defendants attach certain documents to this response, including Communications Executive Officer Mayco Villafaña's affidavit in support of this response.

## INTRODUCTION AND FACTUAL BACKGROUND

1.     Shortly after being hired by The School Board of Miami-Dade County, Florida ("School Board") as a Communications Executive Officer in February, 2002, Mayco Villafaña, as part of his duties, conducted a review of the use of the press room, which is located in the auditorium of the School Board Administration Building. <u>See</u> Villafaña affidavit attached hereto as Exhibit A ¶ 2.

2.     Specifically, the press room is an enclosed room of limited capacity located towards the rear right-hand corner of the auditorium, and has a few chairs, phones, outlets for computer connections, and desks, and is reserved for the media. <u>See</u> Exhibit A ¶ 3.

3.     Due to time pressures of the media to report the news gathered at School Board meetings for the evening/nightly news or for the next day's newspapers, the School Board supplied the desks, chairs and phones to enable the media to work on their laptops at the desks or call their editors at the media stations in order to meet their deadlines. <u>See</u> Exhibit A ¶ 4.

2

United Teachers of Dade, et. al. v. Miami-Dade County School Board, et al.
U.S.D.C. Case No. 02-21932 CIV-Ungaro Benages

4.      While reviewing the use of the press room by the media, Mr. Villafaña researched the procedures in place at several other public school districts across the country and spoke with media members using the press room. See Exhibit A ¶ 5.

5.      During Mr. Villafaña's review, it was discovered that the press room was being utilized for unintended reasons.  For example, the press room was being occupied by non-media members who would (1) arrive early and take up all the seats with desk spaces in which media members were to use their laptops, (2) use the press room as a staging area for organizing protests, (3) take up the remaining seating reserved for the press, (4) lobby their own point of view on a variety of issues, and (5) verbally attack media members who do stories not to their liking. See two letter attached hereto as composite exhibit B; see also ex. A, ¶ 5.

6.      Based on the overcrowding and disruption concerns discovered through Mr. Villafaña's review, and the requests from reporters for a press room unfettered from any undue influence, the Office of Public Relations, through the Superintendent of Miami-Dade Public Schools, enacted Press Room Procedures as an administrative directive on May 15, 2002. See Press Room Procedures attached hereto as Exhibit C; see also ex. A, ¶ 6.

7.      The Press Room Procedures serve to limit the use of the limited capacity press room to the media defined as individuals employed by a newspaper or broadcast organization intended primarily for general-circulation (hereafter referred to as the "working media" or "general-circulation media"), as opposed to those individuals employed by a newspaper primarily intended for members of a particular profession or occupation

3

United Teachers of Dade, et. al. v. Miami-Dade County School Board, et al.
U.S.D.C. Case No. 02-21932 CIV-Ungaro Benages

(hereafter referred to as "non-general circulation media" or "the particular-profession media"). Accordingly, only those media personnel who work for the "general-circulation media" are to be considered "accredited news gatherers" for purposes of using the press room. See Press Room Procedures attached hereto as Exhibit C; see also ex. A, ¶ 7.

8.      All other individuals not employed by the general-circulation media, including, but not limited to all School Board employees, School Board members, vendors, lobbyists, legal representatives, union members, or any member of the public are prohibited from utilizing the press room. See Exhibit C; see also ex. A, ¶ 7.

9.      The Press Room Procedures were enacted for purposes of general application, not to exclude any particular individual or entity. See ex. A, ¶ 9.

10.      Nowhere in either the complaint or in the motion for preliminary injunction do Plaintiffs allege that they have been denied access to the auditorium at the School Board Administration Building during a School Board meeting or that they have been denied access to any information, newsworthy issue, or news source at the School Board meetings. Accordingly, no First Amendment right is implicated here.

11.      Plaintiffs allege only that they have been denied into a press room where they can sit in chairs and put their laptops, if any, on the desks, and make phone calls to their editors.

12.      Plaintiffs, however, make no allegations either in the complaint, motion, or affidavit that they use the phones to call their editors[1] from the press room or even bring

---

[1]      Plaintiff Katz is the editor of the UTD Today Newsletter. See Katz' Affidavit.

laptops to the School Board meetings in order to use the computer connections in the press room. The only purpose therefore that Plaintiffs wish to enter the press room for is to have chairs to sit in, lobby their own point of view on a variety of issues, and verbally attack media members who do stories not to their liking.  See Composite exhibit C attached hereto.  This can easily be done anywhere in the auditorium and does not implicate the First Amendment.

13.     Notwithstanding the foregoing, Defendants have provided Plaintiffs, as well as all other "non-general circulation media," with a similar room as the press room parallel to the press room in the auditorium equipped with phones, chairs, and computer connection accessibility.  See Exhibit D attached hereto; see also exhibit A, ¶¶ 10, 11.

**MEMORANDUM OF LAW**

**I.     PRELIMINARY INJUNCTION STANDARD**

In order to satisfy the requirements for a preliminary injunction, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir.1998) (citing All Care Nursing

Serv. Inc. v. Bethesda Memorial Hosp., 887 F.2d 1535, 1537 (11th Cir.1989)).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the

movant clearly establishe[s] the 'burden of persuasion' as to the four requisites." Id. "The

burden of persuasion in all of the four requirements is at all times upon the plaintiff." Snook

v. Trust Co. of Georgia Bank of Savannah, N.A., 909 F.2d 480, 483 (11th Cir.1990)

(citations omitted).  When a movant is unable to show a likelihood of success on the merits,

the court may deny the motion for preliminary injunction without making a determination of

the other factors.  See Michigan State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir

1997).  Accordingly, we first address whether Plaintiffs have satisfied their burden of

showing a substantial likelihood that they will succeed on the merits.

## II.    NO LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE PLAINTIFFS HAVE NOT BEEN DENIED ACCESS TO ANY INFORMATION

### a.    No First Amendment Right Implicated

Plaintiffs' main argument in the complaint and the motion for preliminary injunction

is that their First Amendment rights to freedom of the press have been violated because

Defendants have enacted procedures which have the effect of excluding Plaintiffs from

using the phones, chairs, and desks in the press room during School Board meetings.

Accordingly, Plaintiffs argue that Defendants must show a compelling interest for restricting

their exercise of their First Amendment rights.  Nowhere in the complaint or motion,

however, do Plaintiffs allege that they have been denied entrance to the auditorium where

the meetings are held or that they have been denied access to any information, general

press conferences, documents presented at the meetings, or sources of news.  Plaintiffs'

failure to allege that they have been denied **access to any information** is fatal to their

6

injunctive relief request because without such an allegation there can be no regulation of speech and no First Amendment right can be implicated.

We have found no cases in the Supreme Court, Eleventh Circuit or any other circuit which hold that a reporter or news agency or anyone for that matter has a First Amendment right to access to a chair, phone or desk in a press room.  All of the cases we have found and that Plaintiffs cite (which are cited for the Court later in this response) concern the issue of whether "plaintiff has been denied access to information".  Only then is a governmental entity required to show a compelling interest for curtailing such a right.  Barring such a denial of access to information and the implication of a constitutional right requires only that Defendants show a legitimate reason for enacting the Press Room Procedures.  See generally Lofton v. Kearney, 157 F. Supp.2d 1372, 1380 (S.D. Fla. 2001)(Where government targets a fundamental right, it must show a compelling state interest; however, if no fundamental right or suspect class is involved, the government's action will be analyzed under the rational-basis test, which grants a strong presumption that the government action is reasonably related to a legitimate government interest.)

One such case that supports Defendants' position that no First Amendment right is implicated here is Snyder v. Ringgold, 40 F. Supp.2d 714 (D. Md. 1999).  In Snyder, a journalist sued the director of public affairs for the City of Baltimore claiming that her First and Fourteenth Amendment rights were being violated by the defendant's policy not to speak to plaintiff about a story or grant her interviews so long as plaintiff was not denied access to "general press conferences" and allowed access to files and information provided

7

to other members of the media.  See id. at 717-718.  In dissolving a previously entered preliminary injunction and granting summary judgment for the defendant, the court held that the defendant's actions and policy did not violate plaintiff's First Amendment or Fourteenth Amendment rights.  The court explained that "no reporter has a right to a particular interview, exclusive story, or off the record statement."  So long as plaintiff is not denied access to general information provided to other media, no First Amendment right to a free press is violated.  See id.

Plaintiffs position in this case is even less viable than the plaintiff in Snyder because Plaintiffs here do not and cannot claim that they are being denied access to any information at all.  Plaintiffs do not claim that they are excluded from the School Board meetings or denied any information or documents distributed at the meetings.  Accordingly, Plaintiffs First Amendment rights are not violated in any way.

### b.    Cases cited by Plaintiffs

None of the cases cited by Plaintiffs stands for the proposition that a plaintiff's First Amendment right is violated where there is no denial of access to information which is available to the rest of the media.  To the contrary, all cases cited by Plaintiffs recognize a First Amendment violation only where there has been a denial of access to information.  Plaintiffs, however, make no such allegation here.  Accordingly, all cases cited by Plaintiffs on pages 7-9 to support their position are inapplicable here.  See Consumers Union of United States, Inc. v. Periodical Correspondents' Assoc., 365 F.Supp. 18, 22 (D.D.C. 1973), reversed, 515 F.2d 1341 (D.C. Cir. 1975) ("Members of the press galleries are

8

granted exclusive permission to attend on-the-record daily press conferences held by the Senate leadership and the Speaker of the House.  Membership also facilitates access to press conferences at the White House and administrative agencies"; accordingly **denial of access to press galleries** violates First Amendment); ABC, Inc. v. Cuomo, 570 F.2d 1080 (2d Cir. 1977)(**Denying ABC access to cover campaign** live while allowing NBC and CBS access violated First Amendment); Sherrill v. Knight, 569 F.2d 124 (D.C. Cir. 1977) (Reporter denied press pass to the White House which was a source of news, therefore, reporter **denied access to information**); Lewis v. Baxley, 368 F. Supp. 768 (M.D. Ala. 1973)(state statute requiring press to submit statement of economic interest before being allowed to cover legislative events held unconstitutional because press members who do not comply will be **denied access to legislative events**); and Borreca v. Fasi, 369 F. Supp. 906 (D. Hawaii 1974)(Reporter denied entry to office of Mayor of Honolulu and therefore **denied entry to general news conferences** open to all media held in the Mayor's office held unconstitutional).  Accordingly, because Plaintiffs' cases all involve fact patterns where a plaintiff was denied access to information which was available to others, and because Plaintiffs make no allegation that they were denied access to information, those cases do not support Plaintiffs' position.

### b.   Rational-Basis Test

Because no First Amendment right is implicated here, Defendants need only show that the Press Room Procedures were enacted to serve a legitimate interest.  A review of Mayco Villafaña's affidavit attached hereto plus the strong presumption that the

government action is reasonably related to a legitimate government interest, demonstrates that Plaintiffs have not met their burden of showing a <u>substantial</u> likelihood of success on the merits.

As stated in Mr. Villafaña's affidavit, the Press Room Procedures were enacted to serve the interests of controlling the **disruption** and **space constraint** issues concerning the limited capacity press room, and to provide the general-circulation working media with a room from which they could cover the School Board meetings unfettered from undue influence. The Procedures were enacted after reviewing the use of the press room and discovering that it was being used for improper purposes including being occupied by non general-circulation media members who would arrive early and take up all the seats, using the press room as a staging area for organizing protests, taking up the remaining seating reserved for the press, lobbying their own point of view on a variety of issues, and verbally attacking media members who do stories not to their liking. As a result of the review and these findings, the Press Room Procedures were put in place as an administrative directive.

Furthermore, given the short deadlines that the general-circulation media usually have in writing or broadcasting stories that same night or the next morning, providing a room with phones and desks to place their laptops further serves to assist the general-circulation media in meeting their deadlines and to timely get the news from the School

10

Board meetings out to the general public.[2]  Accordingly, given the above-stated legitimate interests, providing a press room for the general-circulation media satisfies the rational-basis test.  See generally Snyder v. Ringgold, 133 F.3d 917, (4th Cir. 1998) (Unpublished opinion cited as 1998 WL 13528, at p4 of WL cite) (recognizing **space constraints** as a legitimate interest when limiting only certain reporters to attend White House press conferences and rejecting plaintiff's argument and stating that "plaintiff's rule would still presumably preclude the White House's practice of allowing only certain reporters to attend White House press conferences, even though space constraints make it impracticable to open up the conference to all media organizations.").

### c.    Defendants may look to statutes and dictionaries for definitions

Plaintiffs' argument that Defendants cannot look to the Florida Statutes or plain-meaning dictionaries for guidance in seeking definitions for terms in the Press Room Procedures is mistaken. To the contrary, Defendants may look to definitions in statutes and Black's Law Dictionary to define the media allowed in the press room.  See generally Certain British Underwriters at Lloyds of London, England v. Jet Charter Services, Inc., 789 F.2d 1534, 1536 (11th Cir. 1986)(when seeking to define an undefined term, court may look to everyday usage to determine its meaning including Black's Law Dictionary) citing Security Insurance Company of Hartford v. Commercial Credit Equipment Corp., 399 So. 2d 31, 34 (Fla. 3d DCA 1981).  In this case, in looking to define the term "newspaper", Defendants

---

[2]    UTD Today's Newsletter does not have the time pressures of the general circulation media because its newsletter is printed monthly.  See Katz' Affidavit.

looked to the Florida Statutes and Black's Law Dictionary, which defines "newspaper" as "[a] publication, usually in sheet form, **intended for general circulation**, and published regularly at short intervals, containing information and editorials of current events and news of general interest." (Emphasis added).

Defendants also looked at the Florida Statutes for guidance in defining the media allowed to use the press room to serve its legitimate interests as stated above. The Florida Statutes distinguished newspapers between general circulation newspapers and those newspapers "intended primarily for members of a professional or occupational group." See §§ 97.021, 163.3164, 165.031, 171.031 Fla. Stat. (2001). Based upon these definitions and distinctions in newspapers, Defendants were able to define the newspaper-type media for purposes of press room utilization. Plaintiffs argument, therefore, that the above-stated statutes do not support Defendants' argument is irrelevant because the statutes were referenced simply for guidance to define the terms in the Press Room Procedures.

**d.      Defendants may accredit media to use the press room**

On page 12-14, Plaintiffs argue that Plaintiff Katz may not be excluded from the press room because she has UTD credentials, and therefore, is an accredited news gatherer for purposes of the press room. Plaintiffs' argument appears to miss the point.

The Press Room Procedures allow access to the press room only if the definition of "general-circulation media" is met. Only then is the individual "accredited" to use the press room. Simply because Plaintiff Katz has UTD credentials does not automatically satisfy the definition in the Press Room Procedures in order to use the press room.

Accordingly, Plaintiffs' argument is meritless.

### e. **Plaintiffs not entitled to due process protections**

As stated previously, neither Plaintiffs' complaint nor motion allege a denial of access to information afforded others in order to implicate a constitutional right. Nor do Plaintiffs allege that a property or liberty interest right has been violated. Accordingly, Plaintiffs are not entitled to a due process hearing of any kind.

### f. **Conclusion**

Therefore, because Plaintiffs have not alleged or demonstrated the implication of a First Amendment right in this case, Plaintiffs fail to satisfy their burden of showing that there is a substantial likelihood that they will succeed on the First Amendment issue at trial. Accordingly, because Plaintiffs do not satisfy the first element of the preliminary injunctive test, this Court need not address the remaining factors.

## III. NO IRREPARABLE HARM

The second factor of the four-pronged test is whether Plaintiffs will suffer irreparable injury if the injunction is not granted. It is axiomatic that speculative injury will not support emergency injunctive relief, and that the threat of irreparable injury must be real and imminent. See Getty Images News Services, Corp. v. Department of Defense, 193 F. Supp.2d 112 (D.D.C. 2002). Plaintiffs have neither alleged nor shown facts showing that the threat of irreparable injury is real and imminent.

First, since Plaintiffs do not allege a denial of access of any information, they cannot claim the loss of First amendment freedoms. Simply because they allege "loss of First

13

Amendment freedoms", without a relevant factual setting to support that abstract principle, Plaintiffs cannot satisfy their burden.   Second, Plaintiffs do not allege that they have been excluded from the School Board meetings, missed press conferences, or that they have failed to publish even one single newsletter as a result of not being allowed to use the press room.

Finally, if Plaintiffs' real argument is that they want access to a room with phones, chairs, desks, and computer connection capabilities, and assuming this rises to the level of a constitutional entitlement, then Plaintiffs still will not be irreparably harmed because a room with phones, chairs, desks, and computer connections will be available to all non general-circulation media, including Plaintiffs.   See Villafaña's affidavit as exhibit A. Accordingly, Plaintiffs have failed to satisfy the irreparable injury element of the preliminary injunctive test, and therefore, are not entitled to preliminary injunctive relief.[3]

---

[3]     Defendant Merrett R. Stierheim has been named in this suit in his official capacity only.  Because the School Board of Miami-Dade County has also been sued, we request that only the School Board remain as a party since suing an employee in his official capacity and the employer as well is redundant.  See Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991)

14

<u>United Teachers of Dade, et. al. v. Miami-Dade County School Board, et al.</u>
U.S.D.C. Case No. 02-21932 CIV-Ungaro Benages

## **CONCLUSION**

Plaintiffs have failed to satisfy their burden of proving all four elements of the preliminary injunctive relief test. Accordingly, Defendants respectfully request that Plaintiffs' motion for preliminary injunctive relief be denied.

Respectfully submitted,

H. JAMES MONTALVO, ESQ.
Attorney for Defendants
Fla. Bar. No. 887056
1450 N.E. 2nd Avenue, Suite 400
Miami, Florida 33132
Telephone: (305) 995-1304
Fax: (305) 995-1412

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing  was served by via express mail for next day delivery and facsimile this 8th day of July, 2002, to Robert Rivas, The Rivas Law Firm, 311 S. Calhoun St., Suite 206t, Tallahassee, FL  32301-1802.

H. James Montalvo, Esq.

15

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-21932-CIV-UNGARO-BENAGES
Magistrate Judge Brown

UNITED TEACHERS OF DADE , a labor
organization, and ANNETTE KATZ,

        Plaintiffs,

v.

MERRETT R. STIERHEIM, in his official
capacity as Superintendent of Miami-Dade
County Public Schools, and THE SCHOOL
BOARD OF MIAMI-DADE COUNTY,

        Defendants.

_____/

## AFFIDAVIT OF MAYCO VILLAFAÑA

Before me, the undersigned authority, personally appeared Mayco Villafaña, who after first being duly sworn deposes and says:

1.     My name is Mayco Villafaña and I am over the age of eighteen. I am employed as a Communications Executive Officer by School Board of Miami-Dade County ("School Board") and I make this affidavit based upon my personal knowledge.

2.     Upon being hired by the School Board in February, 2002 as Communications Executive Officer, I began a review of the use of the press room, which is located in the auditorium of the School Board Administrative Building.

3.     The press room is an enclosed room of limited capacity towards the rear right-hand corner of the auditorium, and has a few chairs, phones, outlets for computer connections, and desks.

4.     Due to time pressures of the media to report the news gathered at School Board meetings for the evening/nightly news or for the next day's newspapers, the School Board supplied the above-stated equipment in order to allow the media to work on their laptops at the desks or call their editors at the media stations to meet the imminent deadlines they may have.

5.     In reviewing the use of the press room during School Board meetings, I researched the procedures in place at several other public school districts across the country.  I also learned during my review that the press room was being utilized by non-media personnel for unintended reasons.  For example, I received reports from media members that the press room was being occupied by non-media members who would (1) arrive early and take up all the front seats with desk space in which media members were to use their laptops, (2) use the press room as a staging area for organizing protests, (3) take up the remaining seating reserved for the press, (4) lobby their own point of view on a variety of issues, and (5) verbally attack media members who do stories not to their liking. See two letters attached hereto as composite exhibit B.

6.     Accordingly, because of the overcrowding and disruption concerns, and the fact that reporters want a press room unfettered from any undue influence, the Office of Public Relations, through the Superintendent of Miami-Dade Public Schools, enacted press room procedures as an administrative directive.

7.     The press room procedures enacted on May 15, 2002, restricted use of the press room to the working media defined as individuals employed by a newspaper or

2

<u>United Teachers of Dade, et al.  v. Miami-Dade County School Board, et al.</u>
USDC Case No. 02-21932 CIV-UNGARO-BENAGES

broadcast organization intended primarily for general circulation (hereafter referred to as the "working media" or "general circulation media"),  as opposed to being primarily intended for members of a particular profession or occupation (hereafter referred to as "particular profession media").  Accordingly, only those media individuals who work for  the "general circulation media" are to be considered "accredited news gatherers" for purposes of press room utilization.  Also, persons servicing the needs of the general circulation media, such as retrieving documents and the like, are also allowed inside the press room solely for those purposes.  All other individuals not employed by the general circulation media, including, but not limited to all School Board employees, School Board members, vendors, lobbyists, legal representatives, union members, or any member of the public are prohibited from utilizing the press room.

8.     The press room procedures, however, allow a general circulation media personnel to call any individual into the press room for a quick interview or to quickly clarify a newsworthy issue.  Otherwise, all interviews are to take place outside the press room.

9.     The press room procedures were enacted for purposes of general application, not to exclude any particular individual or entity such as Plaintiffs claim.

10.     On June 7, 2002, I met with Plaintiff Annette Katz and her counsel Robert Rivas to discuss a resolution to this matter.  I told Plaintiff and her counsel that all "particular profession media" would have access to a similar-type room parallel to the press room with telephone and computer connection access.  Plaintiff rejected this offer.

3

11.    Despite Plaintiff Katz' rejection of the offer, a similar-type room as the press room has been set up for utilization by any member employed by a "particular profession media", including Plaintiff Katz.  That room will include chairs, phones and access to computer connection.

12.    At no time has the enactment of the press room procedures denied Plaintiffs access to the information disseminated by the School Board at its meetings.  Plaintiffs have never been instructed not to enter the auditorium where the School Board conducts its meetings.  Nor do Plaintiffs contend that they are denied access to the School Board meetings or any information disseminated therefrom.

**AFFIANT FURTHER SAYETH NAUGHT**.

_____
Mayco Villafaña


**SWORN TO AND SUBSCRIBED** before me this ___ day of July, 2002, by Mayco Villafaña.  He is personally known to me or has produced a Florida Drivers License as identification.

_____
NOTARY PUBLIC, STATE OF FLORIDA

PAMELA CARTER
Notary Public, State of Florida
My Comm. Expires July 08, 2005

_____
(Print, Type or Stamp Commissioned Name of Notary Public)

4

# EXHIBIT B

W P L G / T V 1 0

2002 APR 17 PM 4:16 A POST-NEWSWEEK STATION

OFFICE OF PUBLIC INFORMATION
AND MEDIA RELATIONS

April 11, 2002

Mayco Villafana
Miami-Dade County Public Schools
Public Information Office

Dear Mayco,

I'm writing to make you aware of the many issues involving the PRESS ROOM at the Miami-Dade Public School Auditorium. Realizing that you are new to the district operations, and the Press Room was at the center of a controversy at last month's meeting, I wanted to fill you in on what's been happening in there for the last two years.

The Press Room was where at least three UTD officials always sat....Pat Tornillo, Merri Mann and Annette Katz. They usually got there very early and took up the best seats in the room. Reporters were often forced to sit and take notes on their lap or try to balance their computer on their lap because there was no desk space for them. In addition, UTD used the Press Room as a staging area for their organized protests. Often this involved other unions and other union bosses. They would all congregate in there, talk loud, crowd the room and take up seating for the press. This has been somewhat resolved since the district informed Mr. Tornillo that only the media would be allowed in the room.

Annette Katz continues to sit in the press room as UTD's representative. Her presence however, is very troubling for a number of reasons. Her union is increasingly the subject of media reports. I have never been in another Press Room where subjects of media reports shared space with the media. As a result of her easy access to the media, Mrs. Katz uses her presence to lobby the union's point of view on a variety of issues. Not a problem, except that's not the purpose of that room.

She has verbally attacked me and other reporters when we've done stories she or UTD did not like. She frequently editorializes and often maligns Superintendent Stierheim and certain board members. While I respect her right to free speech and I'm more than capable of fighting back when attacked... it is not the work

environment any member of the media should have to deal with when they enter a "working" Press Room. We go there to do our work, not trade verbal barbs with Mrs. Katz. I have even been forced to ask her to step outside to continue her attack so as not to interrupt the work of other reporters.

While I realize that it is the School Board's Press Room and you can give access as you see fit... I hope you'll consider the ongoing ramifications of non media members being present in that room. Any message a board member or Superintendent or union or the public wants to get across to the media, should be done in the public forum of the public school board meeting. They can even ask for side conversations outside, as most already do.

Please be clear, this is not just a UTD problem. There is one board aide who frequently camps out in there. Several top administrators come in to sit, nap, eat cookies and generally hang out. In fact, the district's Press Room was little more than a party room for a long time, since, as I believe, the media was rarely there. That has changed and we are not going to disappear. I urge you to either create and enforce a professional "working" Press Room or abandon the idea of having one at all. At least the members of the press corps will know what to expect.


Very Sincerely,

Jilda Unruh
Investigative Reporter
(o) 305-325-2435
(fax) 305-325-2335
(e-mail) junruh@click10.com



The Miami Herald
www.herald.com

Mr. Mayco Villafana
Communications Executive Officer
Miami-Dade County Public Schools

April 15, 2002

Dear Mayco:

I would like to call your attention to a situation occurring at monthly
School Board meetings that might be inappropriate:

Members of the United Teachers of Dade staff, including communications
director Annette Katz and occasionally president Pat Tornillo, encamp
themselves in the press room during meetings, at which important
decisions are made that directly affect the UTD.

Ms. Katz, Mr. Tornillo and other union officials are decent folks, and my
concern is not personal. But I believe reporters need to be unfettered as
they report and write their stories, some of which include the UTD.

I will support whatever manner you feel is appropriate to handle this
situation.

Regards,

Bob Radziewicz
Education Editor
The Miami Herald

305-375-3506
bradziewicz@herald.com

KNIGHT RIDDER

# EXHIBIT C

MEMORANDUM                                          May 14, 2002

TO:        Mr. Merrett R. Stierheim
           Superintendent of Schools

FROM:      Mayco Villafaña
           Communications Executive Officer

SUBJECT:   PRESS ROOM PROCEDURES

As you know, the Office of Public Relations oversees a press room located in the auditorium of the School Board Administrative Building (SBAB). Soon after coming on board, I began a review of press room utilization and heard from reporters and M-DCPS public relations staff regarding the lack of procedures governing the use of the press room. I am attaching letters that address some of the media's concerns. In general, press rooms provide reporters an area having desks, phones and chairs (nowadays even Internet connections) from where they can electronically transmit their news stories to their newsrooms or confer with their editors via phone. Reporters want a press room unfettered from any undue influence. Other major school systems nationwide have procedures in place to manage media access to school board meetings. I am attaching a memorandum detailing some of the procedures used by other school districts.

Starting with the May 15th Miami-Dade County School Board meeting, the Office of Public Relations will restrict access to the press room to working media representatives. State statutes generally define working media as individuals employed by a newspaper or broadcast organization intended for general circulation. It does not include a newspaper intended primarily for members of a particular profession or occupation. I am attaching a memorandum from the School Board Attorney dated February 5, 2002, regarding the use of a press room. It provides case law indicating the authority of a public board to establish a room for the use of the press as well as the legal guidance the courts have presented in regards to *accredited news gatherers*.

Individuals who do not meet the above requirements of *accredited news gatherers* will be denied access to the press room. For example, no one employed by the School Board or the School District (except members of the Office of Public Relations and employees who service the room) may have access to the press room. In addition anyone having business before the School Board, addressing the Board, or attempting to influence School District policies will not be allowed in the press room. This includes any and all MDCPS employees working in the district office or any of its regional offices, schools or satellite facilities. This includes, but it is not limited to vendors, lobbyists, their clients and/or their legal representatives, union members or anyone employed by the various labor unions in any capacity including those who work for union publications. Members

of the public attending School Board meetings, regardless of whether they sign to speak before the School Board or not, will not be permitted to enter the press room.

It is the prerogative of any member of the working media to call any individual into the press room who is not a member of the working media as long as the purpose is for a quick interview or a brief clarification of a newsworthy issue. If the interview will be lengthy, reporters will be asked to conduct the interview outside of the press room. Working members of the media are prohibited from inviting friends, associates or anyone not connected with a news assignment from being in the press room at any time.

These rules will apply to any and all official sunshine meetings of the Miami-Dade County School Board taking place in the SBAB auditorium.

Through this memorandum I am asking that you recognize these new procedures as an administrative directive.

MV

MV:ebm
M-808

Attachments

Approved: _____
Merrett R. Stierheim

# EXHIBIT D



# Miami-Dade County Public Schools

## giving our students the world

Board Attorney
Johnny Brown

Miami-Dade County School Board
Perla Tabares Hantman, Chair
Dr. Michael M. Krop, Vice Chair
Frank J. Bolaños
Frank J. Cobo
Dr. Robert B. Ingram
Betsy H. Kaplan
Manty Sabatés Morse
Dr. Marta Pérez
Dr. Solomon C. Stinson

Superintendent
of Schools
Merrett R. Stierheim

July 5, 2002

**Via Facsimile 1-(850) 412-0909**
Robert Rivas, Esq.
The Rivas Law Firm
311 - S. Calhoun Street, Suite 206
Tallahassee, FL. 32301-1801

Re:   **UTD v. Stierheim, Case No. 02-21932-CIV-UNGARO BENAGES**

Dear Mr. Rivas:

I am in receipt of your complaint and motion for preliminary injunctive relief, as well as the Court's Order requiring an expedited response by Monday, July 8, 2002.  As soon the School Board's response is complete, I will expedite it to you.

On a related note, as I told you on the phone at the beginning of the week, I was arranging a meeting with the School Board's administrators to discuss settlement of your case.  The result of that meeting is the following proposal for settlement in order to attempt to resolve this matter without having to expend further judicial resources:

In order to allow your clients the ability to make telephone calls and work on computers, the School Board's administrator-in-charge has set up a similar room adjacent to the press room with phones and the ability to set up computers.  This will allow any telephone calls to be made without having to interrupt the general public, and allows working on computers if so desired.

I hope this resolves the outstanding issues and allows us to amicably resolve this matter. Please let me know if your clients will agree to this offer in order to advise the Court of a settlement and to prevent the Court from having to work expeditiously on our matter.

I look forward to hearing from you soon.  Thank you for your cooperation.

Very truly yours,

H. James Montalvo